Milton Albert, J.
This is a claim for the appropriation of claimants’ land pursuant to sections 305 and 355 of the Education Law, which proceeding is described as State University of New York at Albany, Map No. 62, Parcel No. “ M ”.
The aforesaid map and description were filed in the office of the County Clerk of Albany County on October 7, 1969.
The claim was filed with the Clerk of the Court of Claims and the Attorney-General on March 18, 1970, and has not been *273 assigned or submitted to any other court or tribunal for audit or determination.
The court adopts the description of the appropriated property as shown on the map and description filed in the Albany County Clerk’s Office, a copy of which is attached to the claim and same is incorporated herein by reference.
Claimants were the owners of the property by reason of a deed dated February 12, 1958, from John A. Zeyak and Leila Zeyak, his wife, grantors, to William E. Maloney and Eleanor M. Maloney, grantees, recorded in the Albany County Clerk’s office on March 28, 1958, in Liber 1572 of Deeds, at page 175.
Prior to the appropriation, claimants were the owners of an irregularly-shaped parcel of land, actually rectangular in shape but with two exceptions excluded, located west of Tudor Road and some 500 feet north of Western Avenue in the City of Albany. The parcel contained 8.734± acres and was 1,054.77± feet in depth with 422.09± feet of width at the southerly end (near Western Avenue) and 306.77± feet of width at the northerly end. The property, generally level and slightly above grade, was vacant land. All of the land was appropriated.
The claimants ’ appraiser, basing his appraisal on the reasonable probability of a zoning change from residential to commercial, first valued the property as Residential R1 at $28,545 per acre for a rounded total of $245,000 and then valued the property as multi-family residential R3 and on the basis of sales data added an increment of $10,575 per acre and subtracted $1,956 because of the probability aspect and arrived at a valuation of $37,164 per acre for a rounded total of $324,600. He then proceeded to value the property on the basis of Commercial C-O, based on his belief of a reasonable probability of its being so rezoned, and adjusted his commercial comparables downward to reflect the probability. This resulted in his valuing the property as “ Commercial C-0 ” at $40,000 an acre or $350,000 rounded for the 8.734± acres taken. His final conclusion was for reasonable probability of rezoning to Commercial C-0 and thus his $350,000 as the appropriate damage figure.
The State’s appraiser valued the property as residential as zoned and found a value of $8,000 an acre or $70,000 rounded for the 8.734± acres.
The court viewed the property.
After careful consideration of the testimony at the trial, the appraisals and exhibits in evidence, the demeanor of the wit *274 nesses,.and the court’s view of the subject property, the court finds as follows :
1. A basic question here relates to the highest and best use of claimants’ property before the State’s taking in October, 1969. This, in turn, revolves around the fundamental issue of whether there was at that time a reasonable probability that the property would be rezoned from Residential R1 (single-family) to either multi-family R3 or Commercial C-0 (office building). It was the claimants’ position that there was a reasonable probability of such a rezoning, with the claimants’ appraiser in his appraisal taking the position that rezoning to commercial .C-0 — office building — was strongly probable.
In support of this position, claimants produced as a witness Richard J. Patrick, City Planning Director of the City of Albany, and also introduced into evidence some 19 zoning changes. It was Mr. Patrick’s testimony that he would have recommended a zoning change to multi-family residential or to commercial-office building, provided certain conditions were met, such as the creation of a buffer zone between the rezoned area and the residential area to the east along Tudor Road, that there be a sufficient parking area provided, and that the parking lot lights would be so arranged as not to annoy the Tudor Road residential area. It was also his testimony that he tried to put rezoning applications in shape to please everybody and that recommendations made by him were generally accepted by the interested city officials including the Common Council.
The State in opposition introduced into evidence State’s Exhibit D, which was a newspaper story, dated 2% years before the State’s taking, which described a public hearing in the area with respect to the then proposed general revision of the city’s zoning ordinance. The newspaper story and testimony supporting its essential details tell of a public hearing at School 16, several blocks away, where Tudor Road residents appeared and opposed the proposed rezoning of "claimants’ property from single-family residential to commercial-office building. At that meeting the Mayor was present, as were some members of the Common Council, and the objecting Tudor Jtoad residents were assured that the proposed revised zoning ordinance would be changed and the subject property put back into the residential single-family zone.
At the trial, there also was analysis of the various zoning changes that had been introduced on behalf of the claimants. Basically, these were along commercial arteries in the City *275 of Albany, such as Central Avenue, Colvin Avenue, Washington Avenue, Fuller Road and Western Avenue.
The court notes that the subject property was some 500 feet set back from Western Avenue and that on its southerly side there was commercial development, on its westerly and northerly sides there were the State University and Office Building Campuses, and on the easterly side the Tudor Rpad residential area — which is a fine residential area — with attractive and well landscaped expensive homes.
The court has carefully considered this basic question of probability of rezoning and has come to the conclusion that claimants have not sustained their burden of proof that there was a reasonable probability of rezoning at the time of the State’s taking in October, 1969 for the following reasons:
a. The subject property was set back some 500 feet from Western Avenue and backed up near the Tudor Road residential area. At the public hearing only about 2% years before, the residents of Tudor Road were assured by the Mayor that the then proposed rezoning to commercial-office would be changed back to residential single-family. The court doubts that the Mayor and Common Council would look differently at a zoning change application made 2% years after the public hearing in light of the objections made and the assurances given at the public hearing. The court so finds despite Mr. Patrick’s testimony that at the time of the State’s taking, he would have recommended a change to commercial-office with conditions outlined above. In so doing, the court expresses its doubt, based on the above background of opposition from Tudor Road residents and assurances given to them by responsible city officials only 2% years before, that Mr. Patrick would have been able to put together an application for rezoning here which would have pleased and been acceptable to the Tudor Road residents.
Without such acceptability, the court doubts that the Mayor and Common Council would have gone along with any such affirmative recommendation that Mr. Patrick might have made.
b. In addition to an entrance to the property via University Place from Western Avenue, there was proof of an unopened street named Mansfield Place which would service claimants’ property from Tudor Road. The court considers the existence of Mansfield Place, though unopened at that time, as a negative factor because its existence and availability for traffic to claimants’ property would mean that Tudor Road would experience *276 commercial traffic by those who would want to avoid using, the probably more intensively used access via University Place.
c. The 19 rezonings introduced by the claimants are not impressive with respect to the issue here. As indicated above, they relate to properties with frontages along principal business arteries in the city and the court does not believe they are comparable or show a trend or an indication as to what would happen with respect to claimants’ property set some 500 feet back from Western Avenue.
d. The sub-soil conditions found to exist on claimants’ property were not conducive to full development for commercial or even multi-family uses at the price level for land advanced by the claimants’ appraiser. Clearly, extensive expenditures would have had to be made to utilize the land for multi-family or commercial-office purposes.
The court here concludes that the claimants have failed to prove a reasonable probability of rezoning (Ridgefield Realty Corp. v. State of New York, 42 A D 2d 807; Rebrug Corp. v. State of New York, 42 A D 2d 801) nor have they shown a condition or continuing trend that rendered early rezoning very nearly inevitable (Myers v. State of New York, 39 A D 2d 806, 807).
Accordingly, the court finds that the highest and best use" of claimants’ property before the taking was single-family residential, as zoned. ¡Since this was a total taking, no after highest and best use is found.
2. With respect to the issue of valuation based on the above-found highest and best use, the court notes that claimants’ land, at the time of the State’s taking, was overgrown and unimproved; there were no streets within the property and no basic utilities required for development. Furthermore, there was directly under the sandy surface an unstable and moist layer of black organic and fibrous peat which would have made construction of foundations for substantial buildings there difficult and costly, with single-family structures possible, but with special arrangements for foundations.
Claimants’ appraiser relied on his Sales No. 1 and No. 2 for his indicated value of $28,545 per acre. His Sale No. 1 occurred some two years before the instant taking and was of a 2.56± acre parcel adjacent to that of claimants. Apparently, .it was purchased through a nominee by the Faculty Student Association — SUNT. His Sale No. 2 he described as 2± acres in area. This was located near a new arterial highway — Route 85 — with the land around Tampa Avenue and between *277 Berkshire Avenue and Cortland Street. Based on these two sales, claimants’ appraiser arrived at his above per acre value for residential single-family zoning and highest and best use of claimants’ property.
With respect to his Sale No. 1, it appeared on cross-examination that claimants’ appraiser did not investigate this sale with the grantees or the motivation for the purchase by them. He testified that it was his belief that the association would erect one-family homes there. In his view, seven single-family lots could be laid out. The court considers this against the sale price of $54,500. This computes out to $7,785 per lot plus the costs of development, including streets, utilities, and land preparation. The court is unable to accept this approach of assumed use ’.of his Sale No. 1 and this per lot value for raw, undeveloped land.
As to his Sale No. 2, it was brought out on cross-examination that this was a sale of an approved subdivision with a street and 14 building lots ready for construction of homes thereon. This computes .out to a bit over $4,000 per lot. This sale is not comparable to claimants’ land which was undeveloped, raw land that had not even been subdivided.
The court rejects claimants’ appraiser’s $245,000 valuation on a residence single-family highest and best use based on the above two sales.
In view of the finding by the court in paragraph 1 above concerning highest and best use, the court does not reach consideration of claimants’ appraiser’s remaining sales because they were based on either a multi-family or commercial-office highest and best use.
The State’s appraiser advanced four sales as comparable in his appraisal, but on the trial relied basically on only two of such sales — No. 354 and No. 355 which were nearest to the subject property and also to the State University complex. The court agrees that of the four sales, these latter two are the most comparable because of their similarity and nearness to the subject property and to the State University complex. These sales occurred in July and Máy of 1965, respectively. Sale No. 354 was of a 5± acre parcel, similarly zoned, and sold for $8,600 per acre while Sale No. 355 was of a 3.7± acre parcel, also similarly zoned, which sold for $8,800 per acre.* We thus see a $200 difference in the nature of a size adjustment for 3.7± acres as against 5± acres. Looking at this *278 and at the 8.734± acre size of the subject property, one would expect a comparable size adjustment to produce a per acre value for the subject parcel of approximately $8,400. The State’s appraiser, however, points also to older single-family residences on each of these sales and adjusted both sales down to $8,000 per acre. In the case of Sale No. 354, he said “At $8,600 per acre in 1965 allowing value to the improvement, and smaller size of comparable, and all factors, the comparable supports $8,000 per acre for the vacant subject acreage.”
In the case of Sale No. 355, which sold for $8,800 per acre, he said ££ But small size of the comparable plus the readily useable subject building improvement more than compensates value wise for economics of time and slightly better access of subject. Also, comparable rates a £ plus ’ for residential seclusion and exclusivity. Subject vacant acreage value is estimated, by comparison, at $8,000 per acre.”
Thus, the State’s appraiser made a roughly 10% downward adjustment for size and availability of an older residence — and in one case Sale No. 355, he used this adjustment to offset what he apparently conceded to he a necessary upward adjustment for the ££ economies of time and slightly better access of subject.” With respect to Sale No. 354, we would need to spell this out from his use of the general language “ and all factors.”
The court is not satisfied with his solution of these necessary adjustments. Clearly, downward adjustments are appropriate for size and the older residence buildings, but a time adjustment certainly shotild be made. Backing up near the Tudor Road residential area certainly entitles the subject property to a good rating with respect to quality of residential area.
Claimants’, appraiser testified to a 15% per year time adjustment for his Sale No. 1. The court adopts a total of 30% for the two plus years here involved. Applying such 30% to the State’s appraiser’s $70,000 valuation, the court finds that the before fair market value of the claimants’ property was $91,000 and that claimants are entitled to an award in such amount with appropriate interest.
During the course of the trial, motions were made upon which decision was then reserved. In its decision above, the court has indicated its disposition with respect to some of these motidns. The remainder are now denied.
The claimants are awarded the sum of $91,000 for all damages direct and consequential, with interest thereon from October 7, 1969 to the date of entry of judgment herein,

 These two sales also indicate to the court that claimants’ appraiser’s Sale No. 1 cannot he relied upon here for basing a valuation for the subject property.